UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | | |
|---|---|---|
| REHANA BIBI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:20-cv-1478 |
| | ) | |
| MIR SHAKIL-UR-RAHMAN, | ) | |
| | ) | |
| Serve:  Secretary of the Commonwealth | ) | |
| Service of Process Department | ) | COMPLAINT |
| P.O. Box 2452 | ) | |
| Richmond, VA  23218-2452 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SHAHEENA SHAKIL-UR-RAHMAN, | ) | |
| | ) | |
| Serve:  Secretary of the Commonwealth | ) | |
| Service of Process Department | ) | |
| P.O. Box 2452 | ) | |
| Richmond, VA  23218-2452 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AYESHA YAHYA, | ) | |
| 18924 Longhouse Place | ) | |
| Leesburg, Virginia 20176 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SHOAIB NOORUDDIN YAHYA, | ) | |
| 18924 Longhouse Place | ) | |
| Leesburg, Virginia 20176 | ) | |
| | ) | |
| Defendants. | ) | |

Introductory and Jurisdictional Statement

1.  Plaintiff Rehana Bibi, a citizen of Pakistan and resident of Virginia, brings this action for damages resulting from breach of contract, false imprisonment, violations of minimum-wage and overtime laws, human trafficking, and forced labor in the United States.  The defendants, members of an extremely wealthy and influential Pakistani family, recruited Ms. Bibi, an illiterate woman of modest means and education, to work for them as a domestic servant in their Loudoun County home.  They enticed her with a contract offering good and lawful compensation and working conditions.  Hoping to give her family a better life in Pakistan, Ms. Bibi accepted the offer and agreed to work for the defendants.  She never received the promised compensation or working conditions.  Rather, the defendants subjected her to abuse and held her in forced labor, paying her a pittance for unending work. They confiscated her passport, limited her ability to leave the family home by herself, and restricted her ability to communicate with persons outside their presence.  They coerced and manipulated Ms. Bibi into staying at their home for five years and prevented her from accessing resources that would have allowed her to become acquainted with her rights or to leave their home.  This case arises under the federal Trafficking Victims Protection Act, 18 U.S.C. §§1584 *et seq*., and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201.  This court has jurisdiction over the trafficking claims under 18 U.S.C. §1596, as two of the offenders are present in the United States. The court has jurisdiction over the FLSA claims under 28 U.S.C. §1331, and supplemental jurisdiction over Ms. Bibi's state law claim pursuant to 28 U.S.C. §1367.

<u>Parties</u>

2.   Plaintiff Rehana Bibi is a citizen of Pakistan who currently resides in Manassas, Virginia.  She has a very modest education, is functionally illiterate except for very elementary Urdu, and has been poor all her life.  She is accustomed to "knowing her place" – a low one – within the traditional Pakistani social hierarchy, and is neither inclined nor, without her current assistance, able, to confront wealthy, prominent persons like defendants.

3.   Defendant Mir Shakil-ur-Rahman is a citizen of Pakistan.  He is the founder of Geo TV and owner of the Jang Group of Newspapers founded by his father, both major Pakistani media entities. He is immensely wealthy.  He is married to defendant Shaheena Shakil-ur-Rahman, and is the brother-in-law of defendant Shoaib Nooruddin Yahya and Shoaib's wife, defendant Ayesha Yahya.  He was present when Ms. Bibi arrived in the United States to begin her work in defendants' Loudoun home, and visited the home several times while she was employed there to see that things were going satisfactorily as he had planned.

4.   Defendant Shaheena Shakil-ur-Rahman is a citizen of Pakistan.  She is the first of Mir Shakil-ur-Rahman's two wives.  She is the sister of defendant Shoaib Nooruddin Yahya and sister-in-law of Shoaib's wife, Ayesha Yahya, who is also her cousin.  On numerous occasions she visited the Loudoun home where Ms. Bibi worked while Ms. Bibi was employed there.  She also received numerous calls from Ms. Bibi complaining of her miserable working and living conditions.

5.  Defendant Shoaib Nooruddin Yahya is a resident of Virginia, residing at 18924 Longhouse Place, Leesburg, Virginia 20176.  He is the brother of defendant Shaheena Shakil-ur-Rahman, the husband of defendant Ayesha Yahya, who is also his cousin, and the brother-in-law of defendant Mir Shakil-ur-Rahman.

6.  Defendant Ayesha Yahya is a resident of Virginia, residing at 18924 Longhouse Place, Leesburg, Virginia 20176.  She is the wife of defendant Shoaib Nooruddin Yahya, who is also her cousin, and the sister-in-law of defendants Shaheena Shakil-ur-Rahman and Mir Shakil-ur-Rahman.

7.  The defendants, who form a closely intertwined family clan,[1] are extremely wealthy, well-educated, cosmopolitan representatives of the Pakistani upper class.  As exhibited particularly by defendant Ayesha Yahya, they have traditional classist attitudes towards their perceived social inferiors such as "domestic servants."

Claim For Relief

Background

8.  Ms. Bibi was born in Lahore, Pakistan on January 1, 1975. She comes from, and throughout her life has remained in, very modest financial circumstances.   She did not see her father until her grandmother's funeral when she was about 12 years old, and he contributed nothing to support the family.  She was educated through sixth grade, in Urdu, but can read only very elementary text and knows no other language.

---

[1]For ease of reference, an informal family tree appears as Exhibit A.

9.  Ms. Bibi was married in 1993.  She and her husband have three daughters, born in 1995, 1998, and 2001, and a granddaughter born in 2018.  Her oldest daughter is diabetic and has medical needs that cost money.  Her husband does unskilled garment work in a factory. While he speaks Punjabi, he has no formal education and is illiterate in all languages.  Like Ms. Bibi, he too "knows his place" in the Pakistani social and economic hierchy, and it is not a high one.

10.  Ms. Bibi was not the first of her family to work as what defendants call "domestic servants" for defendants' family.  Ms. Bibi's mother worked for defendants' family in that capacity for 18 or more years.

11.  In 2011, Ms. Bibi, who needed work and was making insufficient money as a cook, began working as domestic servant for a friend of Shaheena Shakil-ur-Rahman's.  She worked there until early 2013.

The Fraudulent Contract

12.  Sometime prior to July 2, 2013, the Shakil-ur-Rahmans, acting for themselves and also as authorized agents for the Yahya defendants, who were intended third-party beneficiaries, proposed an agreement to Ms. Bibi pursuant to which she would accompany family members on a trip to the United States, including travel to Disneyland, and thereafter work in their family home in Leesburg, Virginia.

13.  Ms. Bibi was in need of ongoing employment, as her husband's meager income was insufficient to support the family.   Notwithstanding Ms. Bibi's unhappiness at leaving her family, she agreed to join defendants' family so as to provide her family with much needed funds.

14.   On July 2, 2013, Ms. Bibi was presented, in the office of Mr. Shakil-ur-Rahman, with a contract drafted by him with no input from her or on her behalf.   The contract was written in Urdu as well as English.  Ms. Shakil-ur-Rahman was on the telephone managing the presentation of the contract to Ms. Bibi and her execution of it.  A copy of the English version of the executed contract is attached hereto as Exhibit B, and the contents incorporated herein by reference.

15.   Ms. Bibi was able to read and understand most of the agreement in Urdu.  The words or provisions she could not understand were read for or explained to her.  The Urdu contract corresponds to the attached English version. Ms. Bibi agreed to the terms, and, as directed, signed the Urdu agreement before witnesses on July 2, 2013.  As directed by Ms. Shakil-ur-Rahman, she also signed several English documents, none of which she could read, having been told by Ms. Shakil-ur-Rahman that these were merely "formalities" associated with her new contractual duties.  The English documents were not translated for her, and she had no idea what she had signed, relying solely on the integrity of the Shakil-ur-Rahmans in proceeding as directed.

16.   Among other things, the July 2, 2013, contract provided for the following:

a)      Ms. Bibi would accompany defendants' family on a trip to Disneyland and look after them during their travel and stay in the United States, remaining for a period "as may be deem [*sic*] fit and appropriate by the employer."

b)      All of Ms. Bibi's expenses, including "boarding, lodging, food, medical, etc. shall be borne by the employer."

c)    Ms. Bibi would be paid $15/hour for 40 hours of work per week, and time-and-a-half after eight hours on any day or after forty hours in a week.

d)    Defendants would follow all laws governing the employment of "domestic servants" in the United States, including vacation days and sick days.

e)    Defendants would not withhold Ms. Bibi's passport nor prohibit her from leaving the premises when not on duty.

17.  The Shakil-ur-Rahmanms prepared and presented the July 2 contract to Ms. Bibi intending to be the direct beneficiaries thereof, and also as agents of Ms. Shakil-ur-Rahman's brother Shoaib Nooruddin Yahya and his wife, Ayesha Yahya, full-time residents of the Loudoun County house where Ms. Bibi was to work, and intended third-party beneficiaries of the contract.

18.  On July 10, 2013, Mr. Shakil-ur-Rahman wrote to the United States Ambassador in Islamabad asking for expedited issuance of a United States visa for Ms. Bibi as "My family and I have planned to visit USA, particularly Disney Land (Florida) in the first week of August 2013," and "I wish to have our female servant accompany the family to look after the kids."  Mr. Shakil-ur-Rahman "assure[d]" the ambassador that Ms. Bibi "will return to Pakistan with us."  A copy of the letter is attached as Exhibit C.

19.  Together with his letter requesting a visa for Ms. Bibi, Mr. Shakil-ur-Rahman presented the ambassador with a copy of the July 2, 2013 contract along with two documents purporting to establish that Ms. Bibi had indeed been his family's "female servant" for a period of years.  One was a purported contract back-dated October 26, 2008, and the second a purported renewal thereof back-dated October 25, 2011.  On information and belief, these were the English

documents that Ms. Bibi had signed on July 2, 2013, as "mere formalities" associated with her new contractual undertaking.

20.  The representations in the Urdu/English contract presented to Ms. Bibi on July 2, 2013, and the representations in Mr. Shakil-ur-Rahman's July 10, 2013 letter to the American ambassador, were false and known to be false when presented.  Ms. Bibi had at no time served as defendants' "domestic servant."  Nor did defendants intend to have Ms. Bibi accompany them on a "trip to Disneyland."  Rather, the Shakil-ur-Rahmans conspired with the Yahyas to defraud Ms. Bibi into coming to the United States under false pretenses to work, unremittingly, in the Yahyas home which the SHakil-ur-Rahmans would also visit.

21.  Based on Mr. Shakil-ur-Rahman's false representations, the ambassador saw to the prompt issuance of a visa for Ms. Bibi.  It was good for one year beginning July 18, 2013.

22.  At all relevant times, it was the intent of the Shakil-ur-Rahmans and of the Yahyas to secure Ms. Bibi's ongoing services indefinitely as a Pakistani style "domestic servant" in their Loudoun home, where they knew that she would be isolated and incapable of securing support and assistance in aid of meeting her own needs and desires and understanding and vindicating her rights.  Specifically, defendants sought to and did procure Ms. Bibi's services, under false pretenses, to work, cook, clean, attend to child-care and, significantly, attend to the elderly, ill, and infirm mother of defendants Shaheena Shakil-ur-Rahman and Shoiab NooruddinYahya, and to do so at minimal cost to themselves.

23.  The Shakil-ur-Rahmans made arrangements for Ms. Bibi to travel to this country. She arrived in New York on or about August 18, 2013, having been escorted by Mr. Shakil-ur-Rahman's second wife and his son.  The son brought Ms. Bibi from the airport to a New York

hotel where she was met by Mr. and Ms. Shakil-ur-Rahman, who had come to New York for the occasion.  Ms. Shakil-ur-Rahman and her son then transported Ms. Bibi to the family's Leesburg, Virginia home where the Yahya defendants were living.

24.  Ms. Bibi arrived at the Loudoun home on August 20, 2013.  Except for rare, tightly monitored excursions to attend to her duties, she never left those premises until being rescued five years later as set forth below.

25.  Ms. Shakil-ur-Rahman immediately confiscated Ms. Bibi's passport and gave it to the Yahyas, who hid it from Ms. Bibi.  Ms. Bibi did not see the passport again for some years.

Ms. Bibi's Work

26.  Ms. Bibi began performing her domestic duties the morning after she arrived.  Her work was for the most part directed by Ms. Yahya.  Mr. and Ms. Yahya and the Shakil-ur-Rahmans –  both of whom occasionally visited Loudoun to see how things were going, with Ms. Shakil-ur-Rahman typically staying longer –  were fully knowledgeable about the nature and extent of Ms. Bibi's work as described here.

27.  For the next five years:

a)      Ms. Bibi was solely responsible for all of the household's cooking and presentation of food, cleaning up after meals, cleaning the house except once a week when a cleaning maid came, cleaning the garage, cleaning the family's Dodge Caravan, and attending to the family's laundry.  Apart from her routine duties, she attended to any and every other task assigned by the Yahyas.  She remained on call 24 hours a day for over five years.

b) Ms. Shakil-ur-Rahman would call Ms. Bibi from Pakistan and assign tasks to her, typically related to caring for Ms. Shakil-ur-Rahman's and Mr. Yahya's elderly, ill, and infirm mother Ammatul Nooruddin Yahya (in this paragraph "the elder Ms. Yahya"),  who lived in the house.  In general, Ms. Bibi was placed in charge of caring for the elder Ms. Yahya who, over the course of Ms. Bibi's years of service, became increasingly incapable of caring for herself.  This included, among other things, organizing and administering the elder Ms. Yahya's 8-10 daily pills (by shape and color) and monitoring their proper ingestion by the elder Ms. Yahya, giving her massages, maintaining and monitoring her oxygen supply equipment, and setting up and monitoring use of her nebulizer as required.  Ms. Bibi's work in this regard increased when a home health-care aide who had been caring for the elder Ms. Yahya took days off and, in 2017, stopped working for the family altogether. Ms. Bibi helped the elder Ms. Yahya bathe, dress, and use the bathroom; she cooked for her, cut her nails, and colored her hair as requested. The elder Ms. Yahya, who had an emergency bell that rang in Ms. Bibi's basement living area, called her at all hours of the day or night when she needed assistance.  Ms. Bibi always responded to her calls and did what was necessary.

c) During the years when Ms. Shakil-ur-Rahman was visiting during Ramadan, Ms. Bibi, while not a Muslim herself, attended to preparing, serving, and cleaning up after the pre-dawn Ramadan meal.

d) Ms. Bibi was also in charge of taking care of the Yahya children: a pre-teen son, a younger daughter, and a baby boy born in 2014.  Initially, she prepared the older

childrens' school lunches, helped them with dressing, and monitored their school bags.  While these tasks lapsed as the children got older, until her rescue Ms. Bibi continue to do the childrens' laundry, make their beds, tidy up their rooms, and clean the messes they made.  Ms. Yahya routinely called for Ms. Bibi when her baby cried or needed to be fed.

e)      In preparation for defendants' house parties several times a year, Ms. Bibi would cook for approximately 40-50 guests and then clean up once the party was over. For several years, Ms. Bibi was also responsible for preparing substantial amounts of food to be sent to a local mosque at Ramadan.

f)      Ms. Bibi was required to be on call to serve the defendants at all hours.  She was regularly awakened from sleep with a bell at all hours of the night to attend to one or another of their demands.

g)      When either of the Shakil-ur-Rahmans were at the house, Ms. Bibi would attend to their every need, as directed.

28.  Ms. Bibi satisfactorily performed all the terms of her employment contract.


<u>Ms. Bibi's Hours</u>

29.  Ms. Bibi was permanently on call, 24 hours/day, seven days/week, 52 weeks/year.

30.  At the direction mostly of Ms. Yahya and with the affirmative knowledge and acquiescence of Mr. Yahya and the Shakil-ur-Rahmans, Ms. Bibi worked incessantly seven days a week for over five years, until being rescued.  On days when the family threw a party, this included actual work for as many as 20 hours without stop, in addition to being on call the

-11-

remaining four hours of the day.  The Shakil-ur-Rahmans were aware of Ms. Bibi's incessant

work and her being permanently on call.  This was their purpose in having her come to the

Leesburg home in the first place.

31.  After having worked for defendants in the manner described below for about three

months, Ms. Bibi inquired of Ms. Shakil-ur-Rahman why the terms of her contract were not

being adhered to.  Ms. Shakil-ur-Rahman replied that those terms were simply *pro forma*

statements of no actual consequence.

32.  The Yahyas did not permit Ms. Bibi to take any days off from work. Nor was she

permitted to take breaks during the workday.  If she finished one task, she was given another.  If

she was exhausted and sat down to rest, she was routinely ordered to attend to other work – for

example, making tea for a family member.

33.  With a single exception, during her entire tenure as defendant's domestic servant

Ms. Bibi was not permitted to take off for holidays, weekends, vacation, sick leave, or to attend

church as she had regularly done in Pakistan.  The exception was Christmas Day in some years

when Ms. Bibi was brought to church by Mr. Yahya, permitted to stay for up to one hour, and

brought back home at which time she would return to work.  A practicing Catholic, Ms. Bibi was

never permitted to attend Easter services; she worked instead.

34.  Mr. and Ms. Yahya did not give Ms. Bibi sick days and routinely ignored her

illnesses. Typically, she was forced to work through her periods of illness. Over the course of her

work for over five years, she was brought to a doctor perhaps 6-7 times, each time on an

emergency basis only.

35.   During the course of her servitude, Ms. Bibi was brought to a dentist three times when a dental condition became unbearably painful.  On each occasion she was advised that it was cheaper to have the tooth at issue extracted than to receive other forms of care, and on each occasion extraction was the remedy afforded her by defendants, who had assumed contractual responsibility for her medical care.  She received no bridge, implant, or other corrective treatment following the extraction, and has gaps between her teeth to this day.

36.   Ms. Bibi was not permitted to take off work the day she learned, in April 2014, that her mother had died.  The Yahyas learned of Ms. Bibi's mother's death by phone from her husband around 7:00 A.M., at which time Ms. Bibi was making breakfast for their family.  The Yahyas waited until Ms. Bibi had almost completed her morning chores to inform her of her mother's death.  Ms. Bibi sat on a step-stool in the kitchen and cried, and then went downstairs to call her husband.  After spending about 30 minutes downstairs, she returned upstairs and returned to her work.  She was not offered any time off, nor did she take any.

Ms. Bibi's Living Conditions

37.   Ms. Bibi's living conditions imposed upon her by the Yahyas were abominable:

a)        For the first two years of Ms. Bibi's service, her living quarters were confined to a small, unfinished storage room in the basement of the defendants' house.  The storage room was filled with boxes, shelves, cabinets, and insects.  Ms. Bibi complained incessantly about the insects, and after two years was allowed to sleep in the basement living room.

-13-

b)     For the entirety of Ms. Bibi's service, she did not have a closet or shelf where she could place her belongings.  She lived out of her suitcase.

c)     Initially, when assigned the storage room as her living area, Ms. Bibi slept on a mattress on the floor.  For a few months after Ms. Bibi moved into the basement living area, she slept on the bed in that room.  The Yahyas then had that bed removed and for the rest of her servitude, Ms. Bibi slept on a mattress on the floor.

d)     Ms. Bibi had no privacy.  Ms. Yahya, in particular, came in and out of Ms. Bibi's living space at will and allowed her children to do the same.

e)     Ms. Bibi lacked clothes appropriate for the cold weather during the Loudoun winters.  She had a single jacket, which was a hand-me-down from the elder Ms. Yahya.

38.  Ms. Yahya routinely and casually abused Ms. Bibi, as did the pre-teen son.  On one occasion, after Mr. Yahya learned that his older son had struck Ms. Bibi a second time, he scolded him.  But otherwise, Mr. Yahya, who was aware of the ongoing abuse, silently acquiesced in it rather than confront his wife, who would ask if he was favoring Ms. Bibi over his own wife.  Thus:

a)     Ms. Yahya monitored how often and how long Ms. Bibi was permitted to bathe, complaining that Ms. Bibi was wasting water, particularly hot water, when she showered.  Ms. Yahya required that Ms. Bibi inform her of when she was going to shower and request permission to do so.  Mr. Yahya was aware of and acquiesced in this.

-14-

b)      In Pakistan, Ms. Bibi had typically showered several times a day in the summer, and at least every two to three days in the winter.  After Ms. Bibi had worked for over one year, Ms. Yahya expressly limited Ms. Bibi to one shower every week. Mr. Yayha was aware of and acquiesced in this.

c)      During Ms. Bibi's last year, Ms. Yahya told Ms. Bibi that she was limited to one shower every two weeks.  In protest, Ms. Bibi stopped taking showers altogether for three weeks.  Thereafter, Ms. Yahya relented and permitted Ms. Bibi to shower once a week again. Mr. Yayha was aware of and acquiesced in this.

d)      Although Ms. Bibi cooked their meals, including meat or chicken typically in stews and curries, after about her first 18 months of work, the Yahyas would normally not permit Ms. Bibi to eat meat or chicken.  They told her that she did not need meat or chicken because she was "already fat enough."  After about 2 ½ years she was also prohibited from eating fruit.  She ate no meat or chicken and no fruit for almost three years thereafter.

e)      Ms. Bibi was not permitted to eat with defendants.  Having made their meals, she ate off to the side from her lap, or alone in the basement, without having served herself any meat or chicken.  When guests were present, Ms. Bibi was not permitted to eat the food she had prepared for and served to them.

f)      With the knowledge and acquiescence of Mr. Yahya, Ms. Yahya routinely verbally and psychologically abused Ms. Bibi.  Ms. Yahya regularly called Ms. Bibi "fat," "buffalo," and "cow."

g) Being unable to return to Pakistan for two of her daughters' weddings, Ms. Bibi was also not allowed to take time during the day to view the festivities remotely via use of a Yahya family iPad.  Ms. Bibi had no iPad.

h) The Yahya children disrespected Ms. Bibi on a daily basis, in front of their parents.  They routinely called her  "stupid" in the presence of Ms. Yahya, who did nothing to correct them.  On two occasions, the older Yahya boy struck Ms. Bibi in the back, injuring her.  Ms. Bibi cried and retired to her quarters downstairs without telling anyone what had happened.

I) As a result of being overworked, sleep-deprived, and under-nourished, Ms. Bibi regularly experienced severe headaches and back pains that continue to date. Forbidden as she was to leave the family's home, Ms. Bibi obtained medical treatment for these conditions only on a few occasions when it was obvious that she was seriously unwell.

j) Ms. Bibi was regularly ordered to get off the telephone even when speaking with family members about important subjects.  Ms. Yahya ordered her to get off the phone when Ms. Bibi's husband called to inform her that their daughter was ill and that she should pray for her good health, and when Ms. Bibi's sister called to ask Ms. Bibi about what purchases to make for Ms. Bibi's daughter's wedding. Ms. Yahya also ordered Ms. Bibi to get off the phone when she was called by her brother with whom she had not spoken in a very long time.  In each case, Ms. Bibi did as ordered.

39.  The Shakil-ur-Rahmans were aware of the Yahyas' treatment of Ms. Bibi.  Initially, Ms. Bibi confided in Ms. Shakil-ur-Rahman both in person, when Ms. Shakil-ur-Rahman visited, or when she called the house, about how the Yahyas – particularly Ms. Yahya – were mistreating her.  This was to no avail.   Ms. Shakil-ur-Rahman also witnessed such mistreatment herself when visiting, yet did nothing.

40.  On numerous occasions, Ms. Shakil-ur-Rahman would yell at Ms. Bibi over the phone after Ms. Yahya complained of her, not permitting Ms. Bibi to tell her side of the story. Ms. Shakil-ur-Rahman also drew Ms. Bibi's husband into issues raised by Ms. Bibi's complaints, asking him to calm his wife down.  Ultimately Ms. Bibi stopped complaining to Ms. Shakil-ur-Rahman after nothing was done to assist her.   In general, Ms. Bibi was intimidated into silent acquiescence.


Ms. Bibi's Isolation

41.  None of the defendants undertook to acquaint Ms. Bibi with her rights or how she might exercise them.  To the contrary, having isolated her, they successfully intimidated her into acquiescing in her apparent fate, about which they assured her that she could do nothing.  This was a correct assessment, as Ms. Bibi lacked, as defendants knew she lacked, the requisite language ability, practical skills, financial wherewithal, and personal contacts to act on her own behalf.  She also feared legal difficulties, including arrest, if she left her position, as defendants advised her.

42. Ms. Bibi spoke daily, or almost daily, with her husband by telephone.  While she reported the mistreatment she was receiving, neither she nor her husband believed that they were

in a position to do anything about it except hope for the best.  Ms. Bibi resigned herself to living

out her life working in defendants' home.

43.  Like Ms. Bibi, her husband was scared of antagonizing the Yahyas and the Shakil-

ur-Rahmans – prominent, wealthy, and powerful Pakistanis who readily intimidated him.  He

lacked as well the means to do anything to assist his wife.

44.  Both Ms. Bibi and her husband were accustomed to accepting and living through

unfairness and difficulties.  Nor were they possessed of skills, tools, or assistance to object

effectively to Ms. Bibi's mistreatment.  Ms. Bibi believed that if she had complained of such

matters in Pakistan, the authorities would have believed the defendants, not her.  She thought this

was true in the United States as well, and was also intimidated by the fact that Ms. Yahya had

told her that she would be thrown in jail were she to complain.  From what Ms. Yahya told her,

she understood that she had overstayed the stay permitted by her visa, and feared the possible

consequences of that infraction.

45.  Ms. Bibi was not permitted to leave the family home unaccompanied by one of the

defendants except to take the Yahya children to a neighborhood park, something that happened

5-7 times during her entire period of servitude, for about half an hour each time, during which

she was always accompanied by the Yahya children.  Ms. Yahya would also check on Ms. Bibi

and the children to make sure they went to the park as directed.

46.  Ms. Bibi did not know anyone in the United States other than defendants.  She was

denied any opportunity to meet new friends or integrate into the community.  She was given no

assistance or encouragement to learn English, and spoke only Urdu during all her years with

defendants, negating her ability to deal with the world outside of the house where she worked.

47.  With the acquiescence of Mr. Yahya, Ms. Yahya prevented Ms. Bibi from talking freely and privately to persons visiting their home other than delivery personnel.  During the first two years of Ms. Bibi's service, she was directed to hide herself in the basement whenever the doorbell rang.  Later, when Ms. Bibi was permitted to be in the presence of the defendants' guests, she was ordered to speak only if spoken to, and also to say, if asked, that she had come from a service position in New York, not directly from Pakistan.  She was not to say where she was from.  She was also ordered not to reveal her salary, to say that she did not know what it was, and that Ms. Yahya knew it.

48.  When defendants sought to speak without Ms. Bibi's understanding what was being said, they would either speak in English, which she did not understand, or order her out of the room.

Defendants' Threats

49.  After completing two years of work, Ms. Bibi sought to return to Pakistan.  While she packed her bags and repeatedly declared her intent to return to Pakistan, she had no idea how to arrange this herself.  Defendants, who retained her passport, refused to assist her. They told her that she needed to extend her contract. They also offered to, and did, pay her more money, albeit far less than the contracted-for amount.  Ms. Yahya regularly told Ms. Bibi that because Ms. Bibi's visa had expired, she would get into difficulties with the police and go to jail, whereas the defendants would be fine because they had money and could hire lawyers.  These threats, made by Ms. Yahya on behalf of all defendants, intimidated Ms. Bibi into not fleeing.

-19-

50.  In aid of keeping Ms. Bibi at her work, Ms. Shakil-ur-Rahman would call Ms. Bibi's husband and ask him to direct Ms. Bibi to stop complaining about her conditions of life and work.  Ms. Bibi's husband, who believed what his wife told him but entirely lacked means to assist her, told her that he would pray for her well-being.

51.  Incapable of striking out on her own, unable to receive assistance from her husband, intimidated by the threats made against her were she to leave, having no one else to whom to turn for assistance, and cognizant of her and family's dependance on defendants' family, Ms. Bibi could do nothing to extricate herself from her situation.  Defendants exploited Ms. Bibi's lack of knowledge of English and life and procedures in the United States, and intimidated her into remaining in involuntary servitude to their benefit until her eventual rescue.

52.  After Ms. Bibi finally escaped from defendants' home, acting on her own behalf and on behalf of her husband and the Yahyas Ms. Shakil-ur-Rahman called Ms. Bibi's husband and told him, falsely, that Ms. Bibi had run away with another man.  She expressed concern that Ms. Bibi might fall into the hands of the wrong people, told him that Ms. Bibi had overstayed her visa, and warned him that if she did not return, or if the police were called as Ms. Bibi's husband suggested, she would be arrested.  Fears of just such developments had contributed to Ms. Bibi's involuntarily staying in place over a period of years.

53.  When speaking with Ms. Bibi's husband following Ms. Bibi's flight, Ms. Shakil-ur-Rahman attempted to assure Ms. Bibi's husband that were Ms. Bibi to return, Ms. Yahya would not engage in more abuse of her, thereby expressly confirming her perfect knowledge of the circumstances of Ms. Bibi's work over a period of years.

54.  Following Ms. Shakil-ur-Rahman's call to Mr. Bibi's husband, he was called from someone on behalf of the Shakil-ur-Rahmans who directed him to come to Mr. Shakil-ur-Rahman's office or face arrest and implied police abuse.  On Ms. Bibi's advice, her husband did not report to Mr. Shakil-ur-Rahman's office.

Ms. Bibi's Compensation

55.  Ms. Bibi anticipated being paid $15/hour for up to forty hours of work, plus time-and-a-half overtime, per her contract (Exhibit B).  However, with the knowledge and acquiescence of Mr. Shakil-ur-Rahman and Mr. Yahya, Ms. Shakil-ur-Rahman and Ms. Yahya told Ms. Bibi that she would be paid only in rupees, and not in amounts equivalent to her contractual entitlement.

56.  Lacking means or resources to identify and stand up for her rights under her contract and under law, and fearful of antagonizing her employers, Ms. Bibi reconciled herself to her exploitation at the hands of the defendants.

57.  Ms. Bibi exercised no control whatsoever over the money she was earning.  On some occasions she asked for portions of the monthly remittances to be withheld and applied to a purchase she wished to make privately, for example for a cell phone.  These requests were almost always denied by Ms. Yahya, with the knowledge and acquiescence of Mr. Yahya.

58.  For Ms. Bibi's work as set forth above, defendants paid the following directly to Ms. Bibi's husband in Lahore, which he picked up at the office of Mr. Shakil-ur-Rahman:

| Dates | From the Shakil-ur-Rahmans | From the Yahyas |
|---|---|---|
| August 2013 to December 2014 | 35,000 Pakistani rupees/month | |
| January to June 2015 | 35,000 Pakistani rupees/month | 15,000 Pakistani rupees/month |
| July to August 2015 | 35,000 Pakistani rupees/month | 10,000 Pakistani rupees/month |
| September 2015 to August 2016 | 45,000 Pakistani rupees/month | 10,000 Pakistani rupees/month |
| September 2016 to August 2017 | 55,000 Pakistani rupees/month | 10,000 Pakistani rupees/month |
| September 2017 to February 2018 | 65,000 Pakistani rupees/month | 10,000 Pakistani rupees/month |
| March 2018 | 65,000 Pakistani rupees/month | |
| April to July 2018 | 65,000 Pakistani rupees/month | 10,000 Pakistani rupees/month |
| August to November 2018 | 65,000 Pakistani rupees/month | |

59. In November 2014, Ms. Yahya gave birth to a son.  She asked Ms. Bibi to care for the infant in addition to her other duties.  Ms. Bibi agreed, and the Yahyas promised, orally, to pay her $150/month, in U.S. dollars, in addition to the pay she was otherwise to receive.

60. Ms. Bibi proceeded to take care of the infant, and continued doing so until she escaped.

61. The Yahyas did not pay Ms. Bibi as promised for the additional work required of her on account of the new child.  They paid her nothing extra until January 2015, when, after repeated requests on Ms. Bibi's part, the Yahyas began sending Ms. Bibi's husband 15,000 additional Pakistani rupees each month, without paying Ms. Bibi anything in dollars, as agreed.  These payments are included in the schedule of payments set forth in ¶58.

62. In July 2015, the Yahyas told Ms. Bibi that they would retain, as "savings" for Ms. Bibi, 5,000 of the 15,000 rupees previously sent to Ms. Bibi's husband for her care of the youngest child.  Ms. Yahya said that in this way Ms. Bibi would have some money with her when she went back to Pakistan.  By the time Ms. Bibi escaped her servitude, the Yahyas still

retained 75,000 rupees earned by Ms. Bibi.

63.  On numerous occasions when Ms. Bibi got into arguments with Ms. Yahya  –

typically about wanting to return to Pakistan or about abuse she was receiving at the house  –

Ms. Yahya would tell her that she would never get the money being held for her.  Ms. Bibi never

received the 75,000 rupees Ms. Yahya was supposed to be holding for her, or any portion

thereof.

64.  In March 2018, Ms. Yahya informed Ms. Bibi that since her youngest child was now

older, Ms. Bibi was not entitled to receive as much money as she had when he was an infant.  So

her monthly pay sent to her husband was reduced by 10,000 rupees, and the 5,000 rupees

allegedly being held for her each month by Ms. Yahya was eliminated.  For the period April-July

2018, the 10,000 rupee payments to Ms. Bibi's husband were reinstated, only to be permanently

discontinued in August 2018.

65.  Over the years of Ms. Bibi's servitude, more than two-thirds of her compensation

was picked up in cash by Ms. Bibi's husband at Mr. Shakil-ur-Rahman's office in Lahore.  The

balance was remitted by wire transfer from the Yahyas to Ms. Bibi's husband.  Ms. Bibi saw

none of her pay.

66.  Ms. Bibi routinely complained that she was not being paid as promised.  Once in

2016 and once in 2018, faced with Ms. Bibi's complaint, the Shakil-ur-Rahmans arranged for

Ms. Bibi's husband to pick up an additional 135,000 Pakistani rupees from Mr. Shakil-ur-

Rahman's office, equal to about $860, as additional compensation for her work.

67.  For her five years and more of work, Ms. Bibi was paid a total 3,465,000 Pakistani

rupees, equivalent to less than $25,000, plus room and board.  Her total compensation was

dramatically less than what she was entitled to receive even as a matter of the federal minimum wage of $7.25/hour, to say nothing of her contract.

68.   Defendants posted no notices regarding minimum wage or otherwise as required by law, nor otherwise informed Ms. Bibi of her rights as a worker in the United States. Ms. Bibi was knowingly kept unaware of her rights, including her right to payment pursuant to the FLSA, learning about such things only following her escape from defendants' home.

69.   On information and belief, defendants failed to keep hour and wage records and to pay federal and state taxes on the wages paid to Ms. Bibi, all as required by law.  At all relevant times Ms. Bibi was ignorant of such matters and kept ignorant of them by defendants.

70.   At all relevant times, defendants were Ms. Bibi's employers and she was their employee within the meaning of the FLSA.  All defendants had actual knowledge of their obligation to pay Ms. Bibi in accordance with the governing contract and with the applicable law for all time she was working or on call for work – which was 24 hours/day. Their failure to pay Ms. Bibi as agreed and as required by law was knowing, willful, and not done in good faith, manifesting their disregard of Ms. Bibi's dignity and her rights under law.

Ms. Bibi Escapes

71.   During her period of servitude, Ms. Bibi met an Urdu-speaking woman who learned how poorly Ms. Bibi was being treated by defendants.  She explained to Ms. Bibi that Ms. Bibi had rights, and that she could help Ms. Bibi escape.

72.   Ms. Bibi initially declined her new friend's offers of help for fear of what might happen to her and her family, given what she had been told by defendants and her awareness of

defendants' wealth and prominence.  Ms. Bibi feared that defendants would have her arrested and imprisoned.  To this day, she fears retaliation against her family and those who have assisted her from the defendants, notwithstanding that defendant Mir Shakil-ur-Rahman is currently incarcerated pending trial on charges of alleged wrongful land dealings and related matters.

73.  Ms.  Bibi finally decided to accept her friend's offer to help her flee from defendants' home, as she concluded that if she did not escape she might eventually harm herself. She retrieved her passport, which she had previously discovered while cleaning the house, but not taken, for fear of being found out.  In the early morning of December 7, 2018, while defendants' family was asleep and with the assistance of her friend, Ms. Bibi escaped from defendants' home through a back door in the basement.

74.  During the entire period of her involuntary servitude and isolation by defendants as set forth above, defendants knowingly and deliberately kept Ms. Bibi ignorant of her rights under law, including her right to proper pay and freedom to leave.  It was only following her liberation in December 2018 that she first learned that she had rights under United States law to have been paid pursuant to her contract and in accordance with the minimal standards set by United States law, and recourse for having been held against her will.  With the assistance of her friend who had helped her flee, she sought out counsel to help her vindicate these rights.

75.  Ms. Bibi now lives safely and securely in Northern Virginia.  She is in the process of applying for immigration relief.

76.  As a result of the defendants' actions complained of herein, Ms. Bibi has suffered physical and emotional injury and distress and dramatic economic losses.

77.  On November 20, 2019, Ms. Bibi filed a protective suit in the Circuit Court for the City of  Richmond, Virginia, seeking compensation for each of the counts set forth below.  The case was non-suited on November 13, 2020.  All claims set forth in this complaint are filed in timely fashion.

<u>Causes of Action</u>

<u>Count I</u>

<u>Trafficking For Purposes of Forced Labor in Violation of 18 U.S.C. §1590</u>

78.  As set forth above, defendants knowingly recruited Ms. Bibi in Pakistan and transported her here for the purpose of subjecting her to forced labor in violation of 18 U.S.C. §1590.  Pursuant to 18 U.S.C. §1595, defendants are liable to her for her resulting damages.

<u>Count II</u>

<u>Forced Labor in Violation of 18 U.S.C. § 1589</u>

79.  As set forth above, defendants knowingly provided and obtained Ms. Bibi's forced labor, to their financial benefit, by force, threats of force, serious harm, and threatened abuse of legal process, all in violation of 18 U.S.C. §1589.  Pursuant to 18 U.S.C. §1595, defendants are liable to her for her resulting damages.

Count III

Unlawful Confiscation of Travel Documents in Violation of 18 U.S.C. §1592(a).

80.  As set forth above, defendants knowingly confiscated Ms. Bibi's passport while violating her rights as a trafficked person under 22 U.S.C. §7102(11)(B), in violation of her rights under 18 U.S.C. §1592(a).  Pursuant to 18 U.S.C. §1595, defendants are liable to her for her resulting damages.


Count IV

Involuntary Servitude in Violation of 18 U.S.C. §1584

81.  As set forth above, defendants knowingly and willfully held Ms. Bibi in a state of involuntary servitude for over five years in the United States, in violation of 18 U.S.C. §1584. Pursuant to 18 U.S.C. §1595, defendants are liable to her for her resulting damages.


Count V

Benefitting Financially from Trafficking in Violation of 18 U.S.C. §1593A

82.  As set forth above, defendants knowingly benefitted by engaging in the trafficking and peonage of Ms. Bibi within the meaning of 18 U.S.C. §1593A, and are liable to her for her resulting damages under 18 U.S.C. §1595.

Count VI

Conspiracy to Violate the Trafficking Victims Protection Act

83.  In violation of 18 U.S.C. §1594(b), as set forth above each defendant conspired with

the other defendants to violate the above referenced sections of the Trafficking Victims

Protection Act with regard to Ms. Bibi, and each defendant committed the overt acts in

furtherance of this conspiracy ascribed to him or her as set forth above.  Defendants are liable to

her for her resulting damages pursuant to 18 U.S.C. §1595.

Count VII (Alternative A)

Unpaid Wages in Violation of 29 U.S.C. §§206 and 207

84.  As set forth above, on average, defendants failed to pay Ms. Bibi in accordance with

the requirements of the FLSA.  From August 21, 2013, to December 6, 2018, Ms. Bibi worked a

total of 275 weeks for defendants.  She is entitled to her earnings pursuant to the FLSA for

having been permanently at work or on call for work, plus the same amount in liquidated

damages, minus the pittance she was paid and appropriate credit for her room and board.

Count VII (Alternative B)

Unpaid Wages in Violation of 29 U.S.C. §§ 206 and 207

85.  In the event Mr. & Ms. Shakil-ur-Rahman are held to be third party employers rather

than direct employers of Ms. Bibi under the FLSA, in the alternative to Count VII(A) they are

indebted to Ms. Bibi for her earnings pursuant to the FLSA for having been permanently at work

or on call, including overtime pay for her time in excess of 40 hours/week, plus the same amount

-28-

in liquidated damages, minus the pittance she was paid and appropriate credit for her room and board.

<u>Count VIII (Alternative A)</u>

<u>Breach of Contract</u>

86.  As set forth above, defendants failed to pay Ms. Bibi in accordance with her contract calling for payment for 40 hours/week at $15/hour and time-and-a-half overtime, notwithstanding that pursuant to her contract she was employed full time and on call 24/7 for over five years.  She is entitled to damages in the amount of her contractual entitlement, approximately $957,000.

<u>Count VIII (Alternative B)</u>

<u>*Quantum Meruit*</u>

87.  As set forth above, as compensation for her work for defendants, Ms. Bibi was paid not only far less than the law or her underlying contract required, but far less than the value of her services as a permanently available servant doing their bidding.   If and to the extent that it is found that Ms. Bibi lacks a contract claim against defendants or any of them, Ms. Bibi is entitled to the fair value of her work in an amount equal to at least her entitlement to back-pay under her contract claim.  This claim is pleaded in the alternative to Ms. Bibi's contract claim, in the event that claim fails as a matter of law.

Claim IX

Unjust Enrichment

88.  As set forth above, all defendants profited greatly by Ms. Bibi's services over a period of over five years.  This included not only the the Yahyas, who were the daily beneficiaries of their servant's work, but also the Shakil-ur-Rahmans, who not only secured their "female servant's" work when visiting their relatives in Loudoun, but also secured permanent assistance to the elder Ms. Yahya, the mother of Shaheena Shakil-ur-Rahman for whom all defendants assumed moral and practical responsibility.   Ms. Bibi thus conferred abundant benefits upon all defendants, who had knowledge and appreciation of these benefits and accepted them under circumstances making it inequitable for them to retain these benefits without payment of their value, fairly measured by Ms. Bibi's entitlement to back pay under her contract.

Count X

False Imprisonment

89.  By their actions set forth above, defendants falsely imprisoned Ms. Bibi for a period of over five years.

Count XI

Conspiracy

90.  By their actions set forth above, defendants conspired among themselves to cause the false imprisonment of Ms. Bibi.

\*   \*   \*

Wherefore, Ms. Bibi requests an order of the court granting her the following relief against defendants, individually or jointly and severally as the court may order:

a)      On Ms. Bibi's forthcoming motions, a preliminary and permanent injunction barring defendants and any persons acting in concert with them from conspiring, or engaging in any sort of retaliation, against Ms. Bibi or members of her family,

b)      Her back-pay pursuant to the FLSA in an amount appropriate to the proof at trial, for the period of her servitude to defendants;

c)      Liquidated damages in the amount of her back-pay pursuant to the FLSA;

d)      Compensatory damages appropriate to the proof at trial for defendants' violations of her rights under the Trafficking Victims Protection Act, including but not limited to restitution for the full value of her services to defendants calculated pursuant to 18 U.S.C. §1593(b);

e)      Damages for breach of contract, or alternatively, in *quantum meruit* for the fair value of her services in an amount appropriate to the proof at trial, for the period going back five years before she fled her imprisonment;

f)      Compensation for unjust enrichment in an amount commensurate with the benefits conferred upon defendants by her services;

g)      Her actual damages appropriate to the proof at trial for defendants' false imprisonment of her for over five years;

h)      Punitive damages against all defendants appropriate to the proof at trial for their violation of the Trafficking Victims Protection Act and for false imprisonment;

i)      Pre-judgment, as well as post-judgment interest;

j)      Her costs, including reasonable attorneys' fees; and

k)      Such other relief as is proper.

Ms. Bibi requests trial by jury.

Respectfully submitted,

REHANA BIBI,

By counsel

Dated:   December 3,  2020

Counsel for Plaintiff:


//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com
BibiRahana\Pleadings\Complaint

//s// Matthew T. Sutter
Matthew T. Sutter, #66741
Khadeja Tipu, #93813
Sutter & Terpak, PLLC
7540A Little River Turnpike, First Floor
Annandale, VA 22003
703.256.1800 / Fax: 703. 991.6116
matt@sutterandterpak.com

//s// Alexandra M. Lydon
Alexandra M. Lydon #90122
Dipti Pidikiti-Smith, #73318
Alina Launchbaugh #94217
Legal Services of Northern Virginia
100 N Pitt Street, #307
Alexandria, VA 22314
703.504.9155 / Fax: 571.386.0641
alydon@lsnv.org