UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | | |
|---|---|---|
| REHANA BIBI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case #1:20-cv-1478 (LMB/MSN) |
| | ) | |
| MIR SHAKIL-UR-RAHMAN, | ) | |
| | ) | |
| Service of Original Complaint Pending | ) | |
| Through Hague Convention | ) | |
| | ) | AMENDED COMPLAINT |
| and | ) | |
| | ) | |
| SHAHEENA SHAKIL-UR-RAHMAN, | ) | |
| | ) | |
| Service of Original Complaint Pending | ) | |
| Through Hague Convention | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AYESHA YAHYA, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SHOAIB NOORUDDIN YAHYA, | ) | |
| | ) | |
| Defendants. | ) | |

1

<u>Introductory and Jurisdictional Statement</u>

1. Plaintiff Rehana Bibi, a citizen of Pakistan and resident of Virginia, brings this action for damages resulting from breach of contract, false imprisonment, violations of minimum-wage and overtime laws, human trafficking, and forced labor in the United States. The defendants, members of an extremely wealthy and influential Pakistani family, recruited Ms. Bibi, an illiterate woman of modest means and education, to work for them as a domestic servant in the Loudoun County home owned solely by defendant Shoaib Yahya. They enticed her with a contract offering good and lawful compensation and working conditions. Hoping to give her family a better life in Pakistan, Ms. Bibi accepted the offer and agreed to work for the defendants. She never received the promised compensation or working conditions. Rather, the defendants subjected her to abuse and held her in forced labor, paying her a pittance for unending work. They confiscated her passport, limited her ability to leave the Mr. Yahya's home by herself, and restricted her ability to communicate with persons outside their presence. The defendants coerced and manipulated Ms. Bibi into staying at Mr. Yahya's home for  five years and prevented her from accessing resources that would have allowed her to become acquainted with her rights or to leave the Loudoun County home owned solely by defendant Mr. Yahya. This case arises under the federal Trafficking Victims Protection Act, 18 U.S.C. §§1584 *et seq*., and the Fair Labor Standards Act ("FLSA"),   29 U.S.C. §201. This court has jurisdiction over the trafficking claims under 18 U.S.C. §1596, as two of the offenders are present in the United States. The court has jurisdiction over the FLSA claims under 28 U.S.C. § 1331, and supplemental jurisdiction over Ms. Bibi's state law claim pursuant to 28 U.S.C. §1367.

Parties

2.      Plaintiff Rehana Bibi is a citizen of Pakistan who currently resides in Manassas, Virginia. She has a very modest education, is functionally illiterate except for very elementary Urdu, and has been poor all her life. She is accustomed to "knowing her place" –a low one— within the traditional Pakistani social hierarchy, and is neither inclined nor, without her current assistance, able, to confront wealthy, prominent persons like defendants.

3.      Defendant Mir Shakil-ur-Rahman is a citizen of Pakistan. He is the founder of Geo TV and owner of the Jang Group of Newspapers founded by his father, both major Pakistani media entities. He is immensely wealthy. He is married to defendant Shaheena Shakil-ur-Rahman, and is the brother-in-law of defendant Mr. Yahya and Shoaib's wife, defendant Ayesha Yahya. He was present when Ms. Bibi arrived in the United States to begin her work in Defendant Mr. Yahya's Loudoun home, and visited Defendant Shoaib Nooruddin Yahya's home several times while she was employed there to see that things were going satisfactorily as he had planned.

4.      Defendant Shaheena Shakil-ur-Rahman is a citizen of Pakistan. She is the first of Mir Shakil-ur-Rahman's two wives. She is the sister of defendant Shoaib Nooruddin Yahya and sister-in-law of Shoaib's wife, Ayesha Yahya, who is also her cousin. On numerous occasions she visited Defendant Mr. Yahya's Loudoun home where Ms. Bibi worked while Ms. Bibi was employed there. She also received numerous calls from Ms. Bibi complaining of her miserable working and living conditions.

3

5.      Defendant Shoaib Nooruddin Yahya is a resident of Virginia, residing at 18924 Longhouse Place, Leesburg, Virginia 20176. He is the sole owner of this home and the property upon which it sits, having acquired the property by deed on July 23, 2004.  He owns and operates GCB Services, a business which he operates from his home, which provides staffing services in the fields of engineering and information technology.  He is the brother of defendant Shaheena Shakil-ur-Rahman, the husband of defendant Ayesha Yahya, who is also his cousin, and the brother-in-law of defendant Mir Shakil-ur-Rahman.

6.      Defendant Ayesha Yahya is a resident of Virginia, residing at 18924 Longhouse Place, Leesburg, Virginia 20176. She is the wife of defendant Shoaib Nooruddin Yahya, who is also her cousin, and the sister-in-law of defendants Shaheena Shakil-ur-Rahman and Mir Shakil-ur-Rahman.

7.      The defendants, who form a closely intertwined family clan,[1] are extremely wealthy, well-educated, cosmopolitan representatives of the Pakistani upper class. As exhibited particularly by defendant Ayesha Yahya, they have traditional classist attitudes towards their perceived social inferiors such as "domestic servants."

## Claim For Relief

### Background

8.      Ms. Bibi was born in Lahore, Pakistan on January 1, 1975. She comes from, and throughout her life has remained in, very modest financial circumstances. She did not see her

---

[1] For ease of reference, an informal family tree appears as Exhibit A.

4

father until her grandmother's funeral when she was about 12 years old, and he contributed nothing to support the family. She was educated through sixth grade, in Urdu, but can read only very elementary text and knows no other language.

9.    Ms. Bibi was married in 1993. She and her husband have three daughters, born in 1995, 1998, and 2001, and a granddaughter born in 2018. Her oldest daughter is diabetic and has medical needs that cost money. Her husband does unskilled garment work in a factory. While he speaks Punjabi, he has no formal education and is illiterate in all languages. Like Ms. Bibi, he too "knows his place" in the Pakistani social and economic hierarchy, and it is not a high one.

10.    Ms. Bibi was not the first of her family to work as what defendants call "domestic servants" for defendants' family. Ms. Bibi's mother worked for defendants' family in that capacity for 18 or more years.

11.    In 2011, Ms. Bibi, who needed work and was making insufficient money as a cook, began working as domestic servant for a friend of Shaheena Shakil-ur-Rahman's. She worked there until early 2013.

<u>The Fraudulent Contract</u>

12.    Sometime prior to July 2, 2013, the Shakil-ur-Rahmans, acting for themselves and also as authorized agents for the Yahya defendants, who were intended third-party beneficiaries, proposed an agreement to Ms. Bibi pursuant to which she would accompany family members on a trip to the United States, including travel to Disneyland, and thereafter work in Mr. Yahya's home in Leesburg, Virginia.

13.    Ms. Bibi was in need of ongoing employment, as her husband's meager income was insufficient to support the family. Notwithstanding Ms. Bibi's unhappiness at leaving her

family, she agreed to join defendants' family so as to provide her family with much needed funds.

14.     On July 2, 2013, Ms. Bibi was presented, in the office of Mr. Shakil-ur-Rahman, with a contract drafted by him with no input from her or on her behalf. The contract was written in Urdu as well as English. Ms. Shakil-ur-Rahman was on the telephone managing the presentation of the contract to Ms. Bibi and her execution of it. A copy of the English version of the executed contract is attached hereto as Exhibit B, and the contents incorporated herein by reference.

15.     Ms. Bibi was able to read and understand most of the agreement in Urdu. The words or provisions she could not understand were read for or explained to her. The Urdu contract corresponds to the attached English version. Ms. Bibi agreed to the terms, and, as directed, signed the Urdu agreement before witnesses on July 2, 2013. As directed by Ms. Shakil-ur-Rahman, she also signed several English documents, none of which she could read, having been told by Ms. Shakil-ur-Rahman that these were merely "formalities" associated with her new contractual duties. The English documents were not translated for her, and she had no idea what she had signed, relying solely on the integrity of the Shakil-ur-Rahmans in proceeding as directed.

16.     Among other things, the July 2, 2013, contract provided for the following:

a)     Ms. Bibi would accompany defendants' family on a trip to Disneyland and look after them during their travel and stay in the United States, remaining for a period "as may be deem [sic] fit and appropriate by the employer."

b)     All of Ms. Bibi's expenses, including "boarding, lodging, food, medical, etc. shall be borne by the employer."

6

c)     Ms. Bibi would be paid $15/hour for 40 hours of work per week, and time-and-a-half after eight hours on any day or after forty hours in a week.

d)     Defendants would follow all laws governing the employment of "domestic servants" in the United States, including vacation days and sick days.

e)     Defendants would not withhold Ms. Bibi's passport nor prohibit her from leaving the premises when not on duty.

17.     The Shakil-ur-Rahmans prepared and presented the July 2 contract to Ms. Bibi intending to be the direct beneficiaries thereof, and also as agents of Ms. Shakil-ur-Rahman's brother Shoaib Nooruddin Yahya and his wife, Ayesha Yahya, full-time residents of the Loudoun County house where Ms. Bibi was to work, and intended third-party beneficiaries of the contract.

18.     On July 10, 2013, Mr. Shakil-ur-Rahman wrote to the United States Ambassador in Islamabad asking for expedited issuance of a United States visa for Ms. Bibi as "My family and I have planned to visit USA, particularly Disney Land (Florida) in the first week of August 2013," and "I wish to have our female servant accompany the family to look after the kids." Mr. Shakil-ur-Rahman "assure[d]" the ambassador that Ms. Bibi "will return to Pakistan with us." A copy of the letter is attached as Exhibit C.

19.     Together with his letter requesting a visa for Ms. Bibi, Mr. Shakil-ur-Rahman presented the ambassador with a copy of the July 2, 2013 contract along with two documents purporting to establish that Ms. Bibi had indeed been his family's "female servant" for a period of years. One was a purported contract back-dated October 26, 2008, and the second a purported renewal thereof back-dated October 25, 2011. On information and belief, these were the English

documents that Ms. Bibi had signed on July 2, 2013, as "mere formalities" associated with her new contractual undertaking.

20.     The representations in the Urdu/English contract presented to Ms. Bibi on July 2, 2013, and the representations in Mr. Shakil-ur-Rahman's July 10, 2013 letter to the American ambassador, were false and known to be false when presented. Ms. Bibi had at no time served as defendants' "domestic servant." Nor did defendants intend to have Ms. Bibi accompany them on a "trip to Disneyland." Rather, the Shakil-ur-Rahmans conspired with the Yahyas to defraud Ms. Bibi into coming to the United States under false pretenses to work, unremittingly, in Mr. Yahya's home which the Shakil-ur-Rahmans would also visit.

21.     Based on Mr. Shakil-ur-Rahman's false representations, the ambassador saw to the prompt issuance of a visa for Ms. Bibi. It was good for one year beginning July 18, 2013.

22.     At all relevant times, it was the intent of the Shakil-ur-Rahmans and of the Yahyas to secure Ms. Bibi's ongoing services indefinitely as a Pakistani style "domestic servant" for the maintenance of Mr. Yahya's family and his Loudoun home, where they knew that she would be isolated and incapable of securing support and assistance in aid of meeting her own needs and desires and understanding and vindicating her rights. Specifically, defendants sought to and did procure Ms. Bibi's services, under false pretenses, to work, cook, clean, attend to child-care and, significantly, attend to the elderly, ill, and infirm mother of lefendants Shaheena Shakil-ur-Rahman and Shoaib Nooruddin Yahya, and to do so at minimal cost to themselves.

23.     The Shakil-ur-Rahmans made arrangements for Ms. Bibi to travel to this country. She arrived in New York on or about August 18, 2013, having been escorted by Mr. Shakil-ur-Rahman's second wife and his son. The son brought Ms. Bibi from the airport to a New York

hotel where she was met by Mr. and Ms. Shakil-ur-Rahman, who had come to New York for the

occasion. Ms. Shakil-ur-Rahman and her son then transported Ms. Bibi to Mr. Yahya's

Leesburg, Virginia home where the Yahya defendants were living.

24.     When Ms. Bibi arrived at Mr. Yahya's Loudoun home on August 20, 2013, Mr.

Yahya and Ms. Yahya had been expecting her. Upon arrival to Mr. Yahya's home, Ms. Yahya,

in Mr. Yahya's presence, instructed Ms. Bibi to refer to Mr. Yahya as "Saab-ji" which is the

formal honorary designation by which a servant calls a master in Pakistani culture and in Urdu.

This was clear to Ms. Bibi, who understood their conversations.  The Yahyas' discussion made it

clear tht her arrival had been agreed upon, planned and anticipated by the Yahyas.

25.     Except for rare, tightly monitored excursions to attend to her duties as set forth

below, she never left Mr. Yahya's home until being rescued  five years later as set forth below.

26.     Upon Ms. Bibi's arrival, Ms. Shakil-ur-Rahman immediately confiscated Ms.

Bibi's passport and gave it to Mr. Yahya's sister, Shahina Shakil-Ur-Rahman, who then, in turn,

entrusted the passport to Mr. Yahya's mother, who hid the passport in her red purse in a closet in

her room inside Mr. Yahya's home. Ms. Bibi did not see the passport again for some years.  Upon

information and belief, Mr. Yahya was aware that Ms. Bibi's passport had been delivered by his

sister to his own mother and was hidden in his mother's room in his home.


Ms. Bibi's Work

26.     When Ms. Bibi began performing her domestic duties the morning after she

arrived. Her work was for the most part directed by Ms. Yahya but was also directed by Mr.

Yahya. Mr. Yahya worked from his home and left only infrequently.  He was present

throughout Ms. Bibi's service, and fully knowledgeable about the tasks she was performing and

9

directed to perform for the maintenance of his baby, his mother, his wife and his property.  On more than one occasion, and with some regularity, Mr. Yahya would direct Ms. Bibi to perform household tasks for him including, for instance, preparing food for him and laundering and/or ironing his clothes.  Mr. and Ms. Yahya and the Shakil-ur-Rahmans — both of whom occasionally visited Loudoun to see how things were going, with Ms. Shakil-ur-Rahman typically staying longer — were fully knowledgeable about the nature and extent of Ms. Bibi's work as described here.

27.     For the next five years:

a)     Ms. Bibi was solely responsible for all of the household's cooking and presentation of food, cleaning up after meals, cleaning the Mr. Yahya's house except once a week when a cleaning maid came, cleaning the garage, cleaning the family's Dodge Caravan, and attending to the family's laundry. Apart from her routine duties, she attended to any and every other task assigned by Mr. Yahya, his wife, his children and his mother. She remained on call 24 hours a day for over five years.

b)     Ms. Shakil-ur-Rahman would call Ms. Bibi from Pakistan and assign tasks to her, typically related to caring for Ms. Shakil-ur-Rahman's and Mr. Yahya's elderly, ill, and infirm mother Ammatul Nooruddin Yahya (in this paragraph "the elder Ms. Yahya"), who lived in Mr. Yahya's house. In general, Ms. Bibi was placed in charge of caring for the elder Ms. Yahya by Mr. Yahya.  The elder Ms. Yahya over the course of Ms. Bibi's years of service, became increasingly incapable of caring for herself. This included,  among other things, organizing and administering the elder Ms. Yahya's 8-10 daily pills (by shape and color) and

10

monitoring their proper ingestion by the elder Ms. Yahya, giving her massages, maintaining and monitoring her oxygen supply equipment, and setting up and monitoring use of her nebulizer as required. Ms. Bibi's work in this regard increased when a home health-care aide who had been caring for the elder Mr. Yahya's mother took days off and, in 2017, stopped working for the family altogether. Ms. Bibi helped the Mr. Yahya's mother bathe, dress, and use the bathroom; she cooked for her, cut her nails, and colored her hair as requested. The elder Ms. Yahya, who had an emergency bell that rang in Ms. Bibi's basement living area, called her at all hours of the day or night when she needed assistance. Ms. Bibi always responded to her calls and did what was necessary. Everyone in Mr. Yahya's home could hear the bell when it rang.

c) During the years when Ms. Shakil-ur-Rahman was visiting during Ramadan, Ms. Bibi, while not a Muslim herself, attended to preparing, serving, and cleaning up after the pre-dawn Ramadan meal.

d) Ms. Bibi was also in charge of taking care of the Yahya children: a pre-teen son, a younger daughter, and a baby boy born in 2014. Initially, she prepared the older childrens' school lunches, helped them with dressing, and monitored their school bags. While these tasks lapsed as the children got older, until her rescue Ms. Bibi continue to do the childrens' laundry, make their beds, tidy up their rooms, and clean the messes they made. Ms. Yahya routinely called for Ms. Bibi when her baby cried or needed to be fed.

e) Mr. Yahya on more than one occasion, promised Ms. Bibi that she would be paid extra for taking care of his baby. But when Ms. Bibi informed Mr. Yahya, on

more than one occasion, that she was not receiving the extra money to take care
of his baby he did not respond.  And when she raised this with Ms. Yahyha, in
Mr. Yahyas' presence, Ms. Yahya would state they, referring to herself and Mr.
Yahya, did not wish to discuss it at that time.

f) In preparation for defendants' house parties several times a year, Ms. Bibi would
cook for approximately 40-50 guests and then clean up once the party was over.
For several years, Ms. Bibi was also responsible for preparing substantial
amounts of food to be sent to a local mosque at Ramadan.

g) Ms. Bibi was required to be on call to serve the defendants at all hours. She was
regularly awakened from sleep with a bell at all hours of the night to attend to one
or another of their demands.

h) When either of the Shakil-ur-Rahmans were at Mr. Yahya's house, Ms. Bibi
would attend to their every need, as directed.

28. Ms. Bibi satisfactorily performed all the terms of her employment contract.


Ms. Bibi's Hours

29. Ms. Bibi was permanently on call, 24 hours/day, seven days/week, 52 weeks/year.

30. At the direction mostly of Ms. Yahya and with the affirmative knowledge and
acquiescence of Mr. Yahya and the Shakil-ur-Rahmans, Ms. Bibi worked incessantly seven days
a week for over five years, until being rescued. On days when the family threw a party, this
included actual work for as many as 20 hours without stop, in addition to being on call the

remaining four hours of the day. The Shakil-ur-Rahmans were aware of Ms. Bibi's incessant work and her being permanently on call. This was their purpose in having her come to Mr. Yahya's Leesburg home in the first place.

31.    After having worked for defendants in the manner described below for about three months, Ms. Bibi inquired of Ms. Shakil-ur-Rahman why the terms of her contract were not being adhered to. Ms. Shakil-ur-Rahman replied that those terms were simply *pro forma* statements of no actual consequence.

32.    Ms. Yahya, on information and belief with the knowledge of and approval of Mr. Yahya, did not permit Ms. Bibi to take any days off from work. Nor was she permitted to take breaks during the workday. If she finished one task, she was given another. If she was exhausted and sat down to rest, she was routinely ordered to attend to other work — for example, making tea for a family member.

33.    With a single exception, during her entire tenure as defendant's domestic servant Ms. Bibi was not permitted to take off for holidays, weekends, vacation, sick leave, or to attend church as she had regularly done in Pakistan. The exception was Christmas Day in some years when Ms. Bibi was brought to church by Mr. Yahya, permitted to stay for up to one hour, and brought back home at which time she would return to work. A practicing Catholic, Ms. Bibi was never permitted to attend Easter services; she worked instead. Mr. Yahya was aware of Ms. Bibi's religion, a devout Catholic, and would not permit her to go to church and she was only permitted to attend mass when he transported her.

34.    Mr. and Ms. Yahya did not give Ms. Bibi sick days and routinely ignored her illnesses. Typically, she was forced to work through her periods of illness. Over the course of

her work for over five years, she was brought to a doctor perhaps 6-7 times, each time on an emergency basis only.

35.     During the course of her servitude, Ms. Bibi was brought to a dentist three times when a dental condition became unbearably painful. On each occasion she was advised that it was cheaper to have the tooth at issue extracted than to receive other forms of care, and on each occasion extraction was the remedy afforded her by defendants, who had assumed contractual responsibility for her medical care. She received no bridge, implant, or other corrective treatment following the extraction, and has gaps between her teeth to this day.

36.     Ms. Bibi was not permitted to take off work the day she learned, in April 2014, that her mother had died. The Yahyas, including, on information and belief, Mr. Yahya, learned of Ms. Bibi's mother's death by phone from her husband around 7:00 A.M., at which time Ms. Bibi was making breakfast for their family. The Yahyas, including, on information and belief, Mr. Yahya, waited until Ms. Bibi had almost completed her morning chores to inform her of her mother's death. Ms. Bibi sat on a step-stool in the kitchen and cried, and then went downstairs to call her husband. After spending about 30 minutes downstairs, she returned upstairs and returned to her work. She was not offered any time off, nor did she take any.


        Ms. Bibi's Living Conditions

37.     Ms. Bibi's living conditions imposed upon her by the Yahyas inside Mr. Yahya's home, were abominable:

        a)      For the first two years of Ms. Bibi's service, her living quarters were confined to a small, unfinished storage room in the basement of Mr. Yahya's house. The storage room was filled with boxes, shelves, cabinets, and insects. Ms. Bibi

complained incessantly about the insects, and after two years was allowed to
sleep in the basement living room.

b)      For the entirety of Ms. Bibi's service, she did not have a closet or shelf where she
could place her belongings. She lived out of her suitcase.

c)      Initially, when assigned the storage room as her living area, Ms. Bibi slept on a
mattress on the floor. For a few months after Ms. Bibi moved into the basement
living area, she slept on the bed in that room. Ms. Yahya, on information and
belief with the knowledge of and approval of Mr. Yahya, then had that bed
removed from Mr. Yahya's home and for the rest of her servitude, Ms. Bibi slept
on a mattress on the floor.

d)      Ms. Bibi had no privacy. Ms. Yahya, in particular, came in and out of Ms.
Bibi's living space at will and allowed her children to do the same.

e)      Ms. Bibi lacked clothes appropriate for the cold weather during the Loudoun
winters. She had a single jacket, which was a hand-me-down from
Mr. Yahya's mother.

38.     Ms. Yahya routinely and casually abused Ms. Bibi, as did the pre-teen son. On
one occasion, after Mr. Yahya learned that his older son had struck Ms. Bibi a second time, he
scolded him. But otherwise, Mr. Yahya, who was aware of the ongoing abuse, silently
acquiesced in it rather than confront his wife, who would ask if he was favoring Ms. Bibi over
his own wife. Thus:

a)      Ms. Yahya monitored how often and how long Ms. Bibi was permitted to bathe,
complaining that Ms. Bibi was wasting water, particularly hot water, when she
showered. Ms. Yahya required that Ms. Bibi inform her of when she was going

15

to shower and request permission to do so. Mr. Yahya was aware of and acquiesced in this.

b)   In Pakistan, Ms. Bibi had typically showered several times a day in the summer, and at least every two to three days in the winter. After Ms. Bibi had worked for over one year, Ms. Yahya expressly limited Ms. Bibi to one shower every week. Mr. Yahya was aware of and acquiesced in this.

c)   During Ms. Bibi's last year, Ms. Yahya told Ms. Bibi that she was limited to one shower every two weeks. In protest, Ms. Bibi stopped taking showers altogether for three weeks. Thereafter, Ms. Yahya relented and permitted Ms. Bibi to shower once a week again. Mr. Yahya was aware of and acquiesced in this.

d)   Although Ms. Bibi cooked their meals, including meat or chicken typically in stews and curries, after about her first 18 months of work, the Yahyas would normally not permit Ms. Bibi to eat meat or chicken. Both Mr. and Ms. Yahya told her that she did not need meat or chicken because she was "already fat enough." After about 2 ½  years she was also prohibited from eating fruit. She ate no meat or chicken and no fruit for almost three years thereafter.

e)   Ms. Bibi was not permitted to eat with defendants. Having made their meals, she ate off to the side from her lap, or alone in the basement, without having served herself any meat or chicken. When guests were present, Ms. Bibi was not permitted to eat the food she had prepared for and served to them.

f)   With the knowledge and acquiescence of Mr. Yahya, Ms. Yahya routinely verbally and psychologically abused Ms. Bibi. Ms. Yahya regularly called Ms. Bibi "fat," "buffalo," and "cow."

16

g)    On more than one occasion, when Ms. Bibi would protest poor behavior from Ms. Yahya, Mr. Yahya would intervene and instruct his servant Ms. Bibi not to talk back to his wife, Ms. Yahya.

h)    Being unable to return to Pakistan for two of her daughters' weddings, Ms. Bibi was also not allowed to take time during the day to view the festivities remotely via use of a an iPad, which, upon information and belief, Mr. Yahya had purchased for use by his family. Ms. Bibi had no iPad.

i)    The Yahya children disrespected Ms. Bibi on a daily basis, in front of their parents. They routinely called her "stupid" in the presence of Ms. Yahya, who did nothing to correct them. On two occasions, the older Yahya boy struck Ms. Bibi in the back, injuring her. Ms. Bibi cried and retired to her quarters downstairs without telling anyone what had happened.

j)    As a result of being overworked, sleep-deprived, and under-nourished, Ms. Bibi regularly experienced severe headaches and back pains that continue to date. Forbidden as she was to leave Mr. Yahya's home, Ms. Bibi obtained medical treatment for these conditions only on a few occasions when it was obvious that she was seriously unwell.

k)    Ms. Bibi was regularly ordered to get off the telephone even when speaking with family members about important subjects. Ms. Yahya ordered her to get off the phone when Ms. Bibi's husband called to inform her that their daughter was ill and that she should pray for her good health, and when Ms. Bibi's sister called to ask Ms. Bibi about what purchases to make for Ms. Bibi's daughter's wedding. Ms. Yahya also ordered Ms. Bibi to get off the phone when she was called by her brother with whom she had not spoken in a very long time. In each case, Ms. Bibi

did as ordered.  During these occasions, Mr. Yahya was present in the home and

within earshot.  He did not intervene to correct his wife's directions of his

servant.

39.     The Shakil-ur-Rahmans were aware of the Yahyas' treatment of Ms. Bibi. Initially,

Ms. Bibi confided in Ms. Shakil-ur-Rahman both in person, when Ms. Shakil-ur-Rahman visited,

or when she called Mr. Yahya's house, about how the Yahyas, particularly Ms. Yahya — were

mistreating her and how Mr. Yahya would do nothing to correct this misbehavior. This was to no

avail. Ms. Shakil-ur-Rahman also witnessed such mistreatment herself when visiting, yet did

nothing.

40.     On numerous occasions, Ms. Shakil-ur-Rahman would yell at Ms. Bibi over the

phone after Ms. Yahya complained of her, not permitting Ms. Bibi to tell her side of the story.

Ms. Shakil-ur-Rahman also drew Ms. Bibi's husband into issues raised by Ms. Bibi's

complaints, asking him to calm his wife down. Ultimately Ms. Bibi stopped complaining to

Ms. Shakil-ur-Rahman after nothing was done to assist her. In general, Ms. Bibi was

intimidated into silent acquiescence and service toward Mr. Yahya's family and his home.


Ms. Bibi's Isolation

41.     None of the defendants undertook to acquaint Ms. Bibi with her rights or how she

might exercise them. To the contrary, having isolated her, they successfully intimidated her into

acquiescing in her apparent fate, about which they assured her that she could do nothing. This

was a correct assessment, as Ms. Bibi lacked, as defendants knew she lacked, the requisite

language ability, practical skills, financial wherewithal, and personal contacts to act on her own

behalf. She also feared legal difficulties, including arrest, if she left her position, as defendants advised her.

42.     Ms. Bibi spoke daily, or almost daily, with her husband by telephone. While she reported the mistreatment she was receiving, neither she nor her husband believed that they were in a position to do anything about it except hope for the best. Ms. Bibi resigned herself to living out her life working in Mr. Yahya's home.

43.     Like Ms. Bibi, her husband was scared of antagonizing the Yahyas and the Shakil-ur-Rahmans — prominent, wealthy, and powerful Pakistanis who readily intimidated him. He lacked as well the means to do anything to assist his wife.

44.     Both Ms. Bibi and her husband were accustomed to accepting and living through unfairness and difficulties. Nor were they possessed of skills, tools, or assistance to object effectively to Ms. Bibi's mistreatment. Ms. Bibi believed that if she had complained of such matters in Pakistan, the authorities would have believed the defendants, not her. She thought this was true in the United States as well, and was also intimidated by the fact that Ms. Yahya had  told her that she would be thrown in jail were she to complain. From what Ms. Yahya told her, she understood that she had overstayed the stay permitted by her visa, and feared the possible consequences of that infraction.

45.     Ms. Bibi was not permitted to leave the Mr. Yahya's home unaccompanied by one of the defendants except to take the Yahya children to a neighborhood park, something that happened 5-7 times during her entire period of servitude, for about half an hour each time, during which  she was always accompanied by the Yahya children. Ms. Yahya would also check on Ms. Bibi and the children to 'make sure they went to the park as directed.

46.     Ms. Bibi did not know anyone in the United States other than defendants. She was .denied any opportunity to meet new friends or integrate into the community. She was given no assistance or encouragement to learn English, and spoke only Urdu during all her years with defendants, negating her ability to deal with the world outside of Mr. Yahya's house where she worked.

47.     With the acquiescence of Mr. Yahya, Ms. Yahya prevented Ms. Bibi from talking freely and privately to persons visiting  Mr. Yahya's home other than delivery personnel. During the first two years of Ms. Bibi's service, she was directed to hide herself in the basement whenever the doorbell rang. Later, when Ms. Bibi was permitted to be in the presence of the defendants' guests, she was ordered to speak only if spoken to, and also to say, if asked, that she had come from a service position in New York, not directly from Pakistan. She was not to say where she was from. She was also ordered not to reveal her salary, to say that she did not know what it was, and that Ms. Yahya knew it.

48.     When defendants sought to speak without Ms. Bibi's understanding what was being said, they would either speak in English, which she did not understand, or order her out of the room.


Defendants' Threats

49.     After completing two years of work, Ms. Bibi sought to return to Pakistan. While she packed her bags and repeatedly declared her intent to return to Pakistan, she had no idea how to arrange this herself.

50.      On more than one occasion, during Ms. Bibi's service, she would plead with Mr. Yahya and tell him she wanted to leave and go home to Pakistan.  Defendants, who

retained her passport, refused to assist her. They told   her that she needed to extend her contract. They also offered to, and did, pay her more money, albeit far less than the contracted-for amount. Ms. Yahya regularly told Ms. Bibi that because  Ms. Bibi's visa had expired, she would get into difficulties with the police and go to jail, whereas the defendants would be fine because they had money and could hire lawyers. These threats, made by Ms. Yahya on behalf of all defendants, intimidated Ms. Bibi into not fleeing.

51.     In aid of keeping Ms. Bibi at her work, Ms. Shakil-ur-Rahman would call Ms. Bibi's husband and ask him to direct Ms. Bibi to stop complaining about her conditions of life and work. Ms. Bibi's husband, who believed what his wife told him but entirely lacked means to assist her, told her that he would pray for her well-being.

52.     Incapable of striking out on her own, and because of Mr. Yahya's refusal to provide her arrangements to return home despite her pleas, and unable to receive assistance from her husband, intimidated by the threats made against her were she to leave, having no one else to whom to turn for assistance, and cognizant of her and family's dependance on defendants' family, Ms. Bibi could do nothing to extricate herself from her situation and Mr. Yahya's home.  Defendants exploited Ms. Bibi's lack of knowledge of English and life procedures in the United States, and intimidated her into remaining in involuntary servitude to their benefit until her eventual rescue.

53.     After Ms. Bibi finally escaped from Mr. Yahya's home, acting on her own behalf and on behalf of her husband and the Yahyas, Ms. Shakil-ur-Rahman called Ms. Bibi's husband and told him, falsely, that Ms. Bibi had run away with another man. She expressed concern that Ms. Bibi might fall into the hands of the wrong people, told him that Ms. Bibi had overstayed her visa, and warned him that if she did not return, or if the police were called as Ms. Bibi's

husband suggested, she would be arrested. Fears of just such developments had contributed to

Ms. Bibi's involuntarily staying in place over a period of years.

54.     When speaking with Ms. Bibi's husband following Ms. Bibi's flight, Ms.

Shakil-ur-Rahman attempted to assure Ms. Bibi's husband that were Ms. Bibi to return, Ms.

Yahya would not engage in more abuse of her, thereby expressly confirming her perfect

knowledge of the circumstances of Ms. Bibi's work over a period of years.

55.     Following Ms. Shakil-ur-Rahman's call to Mr. Bibi's husband, he was called from

someone on behalf of the Shakil-ur-Rahmans who directed him to come to Mr. Shakil-ur-

Rahman's office or face arrest and implied police abuse. On Ms. Bibi's advice, her husband did

not report to Mr. Shakil-ur-Rahman's office.


Ms. Bibi's Compensation

56.     Ms. Bibi anticipated being paid $15/hour for up to forty hours of work, plus time-

and-a-half overtime, per her contract (Exhibit B). However, with the knowledge and

acquiescence of Mr. Shakil-ur-Rahman and Mr. Yahya, Ms. Shakil-ur-Rahman and Ms. Yahya

told Ms. Bibi that she would be paid only in rupees, and not in amounts equivalent to her

contractual entitlement.

57.     At all relevant times, Mr. Yahya, a businessman with an ongoing business,  had

ready access to U.S. dollars with which to pay Ms. Bibi's wages.  He was acquainted with

employers' obligations toward their employees under American law.  Rather than pay Ms. Bibi

her wages, however, Mr. Yahya participated in, if he did not orchestrate, all defendants' scheme

of not paying Ms. Bibi in dollars, and rather, of remitting to her husband far less value in

Pakistani rupees for her work in his home.  This resulted in Ms. Bibi's being unpaid for her

work, and was used by Mr. Yahya to avoid reporting to state and federal authorities any of Ms. Bibi's wages as required by law, and paying taxes or withholdings required by law.  The non-filings also served to keep secret Ms. Bibi's continued presence in his home once her visa had expired.

58.    Lacking means or resources to identify and stand up for her rights under her contract and under law, and fearful of antagonizing her employers, Ms. Bibi reconciled herself to her exploitation at the hands of the defendants.

59.    Ms. Bibi exercised no control whatsoever over the money she was earning. On some occasions she asked for portions of the monthly remittances to be withheld and applied to a purchase she wished to make privately, for example for a cell phone. These requests were almost always denied by Ms. Yahya, with the knowledge and acquiescence of Mr. Yahya.

60.    For Ms. Bibi's work as set forth above, defendants paid the following directly to Ms. Bibi's husband in Lahore, which he picked up at the office of Mr. Shakil-ur-Rahman:

| Dates | From the Shakil-ur-Rahmans | From the Yahyas |
|---|---|---|
| August 2013 to December 2014 | 35,000 Pakistani rupees/month | |
| January to June 2015 | 35,000 Pakistani rupees/month | 15,000 Pakistani rupees/month |
| July to August 2015 | 35,000 Pakistani rupees/month | 10,000 Pakistani rupees/month |
| September 2015 to August 2016 | 45,000 Pakistani rupees/month | 10,000 Pakistani rupees/month |
| September 2016 to August 2017 | 55,000 Pakistani rupees/month | 10,000 Pakistani rupees/month |
| September 2017 to February 2018 | 65,000 Pakistani rupees/month | 10,000 Pakistani rupees/month |
| March 2018 | 65,000 Pakistani rupees/month | |
| April to July 2018 | 65,000 Pakistani rupees/month | 10,000 Pakistani rupees/month |
| August to November 2018 | 65,000 Pakistani rupees/month | |

61.     In November 2014, Ms. Yahya gave birth to a son. She asked Ms. Bibi to care for the infant in addition to her other duties. Ms. Bibi agreed, and the Yahyas promised, orally, to pay her $150/month, in U.S. dollars, in addition to the pay she was otherwise to receive.

62.     Ms. Bibi proceeded to take care of the infant, and continued doing so until she escaped.

63.     The Yahyas did not pay Ms. Bibi as promised for the additional work required of her on account of the new child. They paid her nothing extra until January 2015, when, after repeated requests on Ms. Bibi's part, the Yahyas began sending Ms. Bibi's husband 15,000 additional Pakistani rupees each month, without paying Ms. Bibi anything in dollars, as agreed. These payments are included in the schedule of payments set forth in ¶58.

64.     In July 2015, the Yahyas told Ms. Bibi that they would retain, as "savings" for Ms. Bibi, 5,000 of the 15,000 rupees previously sent to Ms. Bibi's husband for her care of the youngest child. Ms. Yahya said that in this way Ms. Bibi would have some money with her when she went back to Pakistan. By the time Ms. Bibi escaped her servitude, the Yahyas still

24

retained 75,000 rupees earned by Ms. Bibi.

65.     On numerous occasions when Ms. Bibi got into arguments with Ms. Yahya —
typically about wanting to return to Pakistan or about abuse she was receiving at the house—
Ms. Yahya would tell her that she would never get the money being held for her. Ms. Bibi never
received the 75,000 rupees Ms. Yahya was supposed to be holding for her, or any portion
thereof.

66.     In March 2018, Ms. Yahya informed Ms. Bibi that since her youngest child was
now older, Ms. Bibi was not entitled to receive as much money as she had when he was an
infant. So her monthly pay sent to her husband was reduced by 10,000 rupees, and the 5,000
rupees allegedly being held for her each month by Ms. Yahya was eliminated. For the period
April-July 2018, the 10,000 rupee payments to Ms. Bibi's husband were reinstated, only to be
permanently discontinued in August 2018.

67.     Over the years of Ms. Bibi's servitude, more than two-thirds of her compensation
was picked up in cash by Ms. Bibi's husband at Mr. Shakil-ur-Rahman's office in Lahore. The
balance was remitted by wire transfer from the Yahyas to Ms. Bibi's husband. Ms. Bibi saw
none of her pay.

68.     Ms. Bibi routinely complained that she was not being paid as promised. Once in
2016 and once in 2018, faced with Ms. Bibi's complaint, the Shakil-ur-Rahmans arranged for
Ms. Bibi's husband to pick up an additional 135,000 Pakistani rupees from Mr. Shakil-ur-
Rahman's office, equal to about $860, as additional compensation for her work.

69.     For her five years and more of work, Ms. Bibi was paid a total 3,465,000 Pakistani
rupees, equivalent to less than $25,000, plus room and board. Her total compensation was

25

dramatically less than what she was entitled to receive even as a matter of the federal minimum wage of $7.25/hour, to say nothing of her contract.

70.     Defendants posted no notices regarding minimum wage or otherwise as required by law, nor otherwise informed Ms. Bibi of her rights as a worker in the United States. Ms. Bibi was knowingly kept unaware of her rights, including her right to payment pursuant to the FLSA, learning about such things only following her escape from Mr. Yahya's home.

71.     On information and belief, defendants failed to keep hour and wage records and to pay federal and state taxes on the wages paid to Ms. Bibi, all as required by law. At all relevant times Ms. Bibi was ignorant of such matters and kept ignorant of them by defendants.

72.     At all relevant times, defendants were Ms. Bibi's employers and she was their employee within the meaning of the FLSA. All defendants had actual knowledge of their obligation to pay Ms. Bibi in accordance with the governing contract and with the applicable law for all time she was working or on call for work — which was 24 hours/day. Their failure to pay Ms. Bibi as agreed and as required by law was knowing, willful, and not done in good faith, manifesting their disregard of Ms. Bibi's dignity and her rights under law.

Ms. Bibi Escapes

73.     During her period of servitude, Ms. Bibi met an Urdu-speaking woman who learned how poorly Ms. Bibi was being treated by defendants. She explained to Ms. Bibi that Ms. Bibi had rights, and that she could help Ms. Bibi escape.

74.     Ms. Bibi initially declined her new friend's offers of help for fear of what might happen to her and her family, given what she had been told by defendants and her awareness of

defendants' wealth and prominence. Ms. Bibi feared that defendants would have her arrested and imprisoned. To this day, she fears retaliation against her family and those who have assisted her from the defendants, notwithstanding that defendant Mir Shakil-ur-Rahman is currently incarcerated pending trial on charges of alleged wrongful land dealings and related matters.

75.     Ms. Bibi finally decided to accept her friend's offer to help her flee from Mr. Yahya's home, as she concluded that if she did not escape she might eventually harm herself. She retrieved her passport, which she had previously discovered while cleaning Mr. Yahya's house, but not taken, for fear of being found out. In the early morning of December 7, 2018, while defendants' family was asleep and with the assistance of her friend, Ms. Bibi escaped from Mr. Yahya's home through a back door in the basement.

76.     During the entire period of her involuntary servitude and isolation by defendants as set forth above, defendants knowingly and deliberately kept Ms. Bibi ignorant of her rights under law, including her right to proper pay and freedom to leave. It was only following her liberation in December 2018 that she first learned that she had rights under United States law to have been paid pursuant to her contract and in accordance with the minimal standards set by United States law, and recourse for having been held against her will. With the assistance of her friend who had helped her flee, she sought out counsel to help her vindicate these rights.

77.     Ms. Bibi now lives safely and securely in Northern Virginia. She is in the process of applying for immigration relief.

78.     As a result of the defendants' actions complained of herein, Ms. Bibi has suffered physical and emotional injury and distress and dramatic economic losses.

79.     On November 20, 2019, Ms. Bibi filed a protective suit in the Circuit Court for the City of Richmond, Virginia, seeking compensation for each of the counts set forth below. The case was non-suited on November 13, 2020. All claims set forth in this complaint are filed in timely fashion.

## Causes of Action

### Count I

### Trafficking For Purposes of Forced Labor in Violation of 18 U.S.C. §1590

78. As set forth above, defendants knowingly recruited Ms. Bibi in Pakistan and transported her here for the purpose of subjecting her to forced labor in violation of 18 U.S.C. §1590. Pursuant to 18 U.S.C. §1595, defendants are liable to her for her resulting damages.

### Count II

### Forced Labor in Violation of 18 U.S.C. §1589

79. As set forth above, defendants knowingly provided and obtained Ms. Bibi's forced labor, to their financial benefit, by force, threats of force, serious harm, and threatened abuse of legal process, all in violation of 18 IJ.S.C. § 1589. Pursuant to 18 U.S.C. §1595, defendants are liable to her for her resulting damages.

Count III

Unlawful Confiscation of Travel Documents in Violation of 18 U.S.C. § 1592(a).

80. As set forth above, defendants knowingly confiscated Ms. Bibi's passport while violating her rights as a trafficked person under 22 U.S.C. §7102(11)(B), in violation of her rights under 18 U.S.C. §1592(a). Pursuant to 18 U.S.C. §1595, defendants are liable to her for her resulting damages.

Count IV

Involuntary Servitude in Violation of 18 U.S.C. §1584

81. As set forth above, defendants knowingly and willfully held Ms. Bibi in a state of involuntary servitude for over five years in the United States, in violation of 18 U.S.C. §1584. Pursuant to 18 U.S.C. § 1595, defendants are liable to her for her resulting damages.

Count V

Benefitting Financially from Trafficking in Violation of 18 U.S.C. §1593A

82. As set forth above, defendants knowingly benefitted by engaging in the trafficking and peonage of Ms. Bibi within the meaning of 18 U.S.C. §1593A, and are liable to her for her resulting damages under 18 U.S.C. §1595.

Count VI

Conspiracy to Violate the Trafficking Victims Protection Act

83. In violation of 18 U.S.C. §1594(b), as set forth above each defendant conspired with the other defendants to violate the above referenced sections of the Trafficking Victims Protection Act with regard to Ms. Bibi, and each defendant committed the overt acts in furtherance of this conspiracy ascribed to him or her as set forth above. Defendants are liable to her for her resulting damages pursuant to 18 U.S.C. §1595.

Count VII (Alternative A)

Unpaid Wages in Violation of 29 U.S.C. §§ 206 and 207

84. As set forth above, on average, defendants failed to pay Ms. Bibi in accordance with the requirements of the FLSA. From August 21, 2013, to December 6, 2018, Ms. Bibi worked a total of 275 weeks for defendants. She is entitled to her earnings pursuant to the FLSA for having been permanently at work or on call for work, plus the same amount in liquidated damages, minus the pittance she was paid and appropriate credit for her room and board.

Count VII (Alternative B)

Unpaid Wages in Violation of 29 U.S.C. §§ 206 and 207

85. In the event Mr. & Ms. Shakil-ur-Rahman are held to be third party employers rather than direct employers of Ms. Bibi under the FLSA, in the alternative to Count VII(A) they are indebted to Ms. Bibi for her earnings pursuant to the FLSA for having been permanently at work or on call, including overtime pay for her time in excess of 40 hours/week, plus the same amount

in liquidated damages, minus the pittance she was paid and appropriate credit for her room and board.

## Count VIII (Alternative A)

## Breach of Contract

86. As set forth above, defendants failed to pay Ms. Bibi in accordance with her contract calling for payment for 40 hours/week at $ 15/hour and time-and-a-half overtime, notwithstanding that pursuant to her contract she was employed full time and on call 24/7 for over five years. She is entitled to damages in the amount of her contractual entitlement, approximately $957,000.

## Count VIII (Alternative B)

## *Quantum Meruit*

87. As set forth above, as compensation for her work for defendants, Ms. Bibi was paid not only far less than the law or her underlying contract required, but far less than the value of her services as a permanently available servant doing their bidding. If and to the extent that it is found that Ms. Bibi lacks a contract claim against defendants or any of them, Ms. Bibi is entitled to the fair value of her work in an amount equal to at least her entitlement to back-pay under her contract claim. This claim is pleaded in the alternative to Ms. Bibi's contract claim, in the event that claim fails as a matter of law.

<u>Claim IX</u>

<u>Unjust Enrichment</u>

88. As set forth above, all defendants profited greatly by Ms. Bibi's services over a period of over five years. This included not only the Yahyas, who were the daily    beneficiaries of their servant's work, but also the Shakil-ur-Rahmans, who not only secured their "female servant' s" work when visiting their relatives in Loudoun, but also secured permanent assistance to the elder Ms. Yahya, the mother of Shaheena Shakil-ur-Rahman for whom all defendants assumed moral and practical responsibility. Ms. Bibi thus conferred abundant benefits upon all defendants, who had knowledge and appreciation of these benefits and accepted them under circumstances making it inequitable for them to retain these benefits without payment of their value, fairly measured by Ms. Bibi's entitlement to back pay under her contract.

<u>Count X</u>

<u>False Imprisonment</u>

89. By their actions set forth above, defendants falsely imprisoned Ms. Bibi for a period of over five years.

<u>Count XI</u>

<u>Conspiracy</u>

90. By their actions set forth above, defendants conspired among themselves to cause the false imprisonment of Ms. Bibi.

\*\*\*

Wherefore, Ms. Bibi requests an order of the court granting her the following relief against defendants, individually or jointly and severally as the court may order:

a)    On Ms. Bibi's forthcoming motions, a preliminary and permanent injunction barring defendants and any persons acting in concert with them from conspiring, or engaging in any sort of retaliation, against Ms. Bibi or members of her family,

b)    Her back-pay pursuant to the ELSA in an amount appropriate to the proof at trial, for the period of her servitude to defendants;

c)    Liquidated damages in the amount of her back-pay pursuant to the FLSA;

d)    Compensatory damages appropriate to the proof at trial for defendants' violations of her rights under the Trafficking Victims Protection Act, including but not limited to restitution for the full value of her services to defendants calculated pursuant to 18 U.S.C. §1593(b);

e)    Damages for breach of contract, or alternatively, in *quantum meruit* for the fair value of her services in an amount appropriate to the proof at trial, for the period going back five years before she fled her imprisonment;

f)    Compensation for unjust enrichment in an amount commensurate with the benefits conferred upon defendants by her services;

g)    Her actual damages appropriate to the proof at trial for defendants' false imprisonment of her for over five years;

h)    Punitive damages against all defendants appropriate to the proof at trial for their violation of the Trafficking Victims Protection Act and for false imprisonment;

i)    Pre-judgment, as well as post-judgment interest;

j)      Her costs, including reasonable attorneys' fees; and

k)      Such other relief as is proper.

Ms. Bibi requests trial by jury.

Respectfully submitted,

REHANA BIBI,

By counsel

Dated: April 16, 2021

Counsel for Plaintiff:

//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Nickera S. Rodriguez, #95952
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
703.684.1100/ Fax: 703.684.1104
vmg@robinhoodesq.com
Bibi Rehana\Pleadings\Complaint

//s// Matthew T. Sutter
Matthew T. Sutter, #66741
Khadeja Tipu, #93813
Sutter & Terpak, PLLC
7540A Little River Turnpike, First Floor
Annandale, VA 22003
703.256.1800 / Fax: 703. 991.6116
matt@sutterandterpak.com

//s// Alexandra M. Lydon
Alexandra M. Lydon #90122
Dipti Pidikiti-Smith, #73318
Alina Launchbaugh #94217
Legal Services of Northern Virginia
100 N Pitt street, #307
Alexandria, VA 22314
703.504.9155 /Fax: 571.386.0641
alydon@lsnv.org

34